(25 Misc. Rep. 667.)

## DWIGHT et al. v. WILLIAMS et al.

(Supreme Court, Special Term, Utica County. December 31, 1898.)

1. WEIGHT OF EVIDENCE—UNCONTRADICTED TESTIMONY.
   The uncontradicted testimony of two disinterested witnesses, if reasonable, cannot be disregarded.

2. STATUTE OF FRAUDS—ESTOPPEL.
   Where parties, in reliance on an agreement, have started a business and assumed responsibilities, they are estopped, as to each other, from avoiding the agreement under the statute of frauds.

3. CORPORATIONS—AGREEMENT AMONG TRUSTEES—RESCISSION.
   An agreement among the trustees of a company that accommodation notes indorsed by them shall be preferred over claims held by them against the company is not annulled by the honest error of the trustees in carrying on the business at a loss, after one of their number desired to close it up.

4. SAME—PREFERENCE TO STOCKHOLDER AFTER INSOLVENCY.
   The payment of salary to an officer and stockholder of a company after it is insolvent is an unlawful preference, and void, under 1 Rev. St. p. 603, § 4, providing that, when a company shall have refused to pay any of its evidences of debt, it shall not be lawful for it to assign any of its property to any officer or stockholder for the payment of any debt.

5. SAME—SALARY OF MANAGER.
   The general manager of a company manufacturing pig iron, who has charge of the purchase of raw material, and the employment and payment of from 75 to 100 men, is entitled to a compensation of $4,000 per year.

6. SAME.
   The general manager of a pig-iron manufacturing company, which has ceased manufacturing, and is merely selling out the material on hand, is entitled to a compensation of $2,000 per year.

Action by Mary B. O. Dwight and others against Irvin A. Williams and others to compel defendant Williams to pay about $70,000 and interest to defendant W. A. Matteson, as receiver of the Kirkland Iron Company, on the ground that the company paid that sum to Williams as its president and treasurer in the payment of his individual claims in contemplation of insolvency; thus giving him an illegal preference over the plaintiffs' assignor, Prof. Theodore W. Dwight, who was also a creditor of the company.

W. W. Cook, Adelbert Moot, and P. C. J. De Angelis, for plaintiffs. William Kernan, for defendant Williams.

WRIGHT, J. The company was insolvent, to the knowledge of the trustees, when the payments in question were made. The defendant Williams claims that $54,028.57 of the amount was legally paid because done in pursuance of an agreement between himself and the other members of the board of trustees, whereby the claim which he held against the company should have preference over all other debts, there being no other creditors interested; and he claims that the balance of said payment, viz. $16,329.10, was legally paid as a salary for services as general manager of this company. The plaintiffs claim that all said payments were void, and that the money should be refunded to the receiver for equal distribution among the creditors of said company, in proportion to their respective claims against it. The Kirkland Iron Company was incorporated in January, 1880, for the man-

ufacture and sale of pig iron. In January, 1887, its capital stock was $50,000, owned by Theodore W. Dwight and Irvin A. Williams in equal shares. The company then owed Dwight $28,500, and owed Williams the same amount, for which each held the promissory note of said company. On that date, Dwight and Williams each sold to Edward B. Bulkley $5,000 stock. The stock was then owned as follows: Dwight, $20,000; Williams, $20,000; and Bulkley, $10,000. They were the trustees of the company, Dwight being president. For some time prior to this date the company had done no business. It had no money in the treasury and no material for manufacture. The following method was adopted, by an agreement of said gentlemen, individually, to raise funds with which to carry on business. They, as a board of trustees, however, took no action thereon. It was orally agreed that promissory notes should be made by the company; that the trustees individually should indorse them for the accommodation of the company in proportion to their respective shares in the capital stock; that the company should procure them to be discounted at banks, and use the proceeds thereof for the purpose of carrying on its business in the manufacture and sale of iron; that the said notes should be renewed from time to time, according to the requirements of the business, and that the iron manufactured should stand as security for the payment of said accommodation notes; and that said accommodation notes should be paid prior to the payment of the said old notes of $28,500 each, which were held against the company by Dwight and Williams. Such accommodation notes were accordingly made, and the business was thereafter carried on by means of said indorsed notes, and on December 7, 1891, $54,028.57 of the money above mentioned as involved in this action was used by the company in the payment of such indorsed notes, with interest thereon, which were held by Williams. The face amount of said notes was $53,500. Dwight was an indorser thereon to the amount of $10,000, and Williams $43,500. This payment was in accordance with said agreement.

The plaintiffs claim, as above stated, that no such agreement existed as above set forth; but it is established by the uncontradicted testimony of two apparently disinterested witnesses. Their testimony, being reasonable, cannot be disregarded. Lomer v. Meeker, 25 N. Y. 361; Denton v. Carroll, 4 App. Div. 532, 40 N. Y. Supp. 19; Cunningham v. Gans, 79 Hun, 434, 29 N. Y. Supp. 979.

The plaintiffs urge that the payment of said notes should not be permitted to stand under said agreement, on the ground that said agreement is void, under the statute of frauds. The answer to that argument is that all the parties relied upon and acted under it, causing the company to incur liabilities in making its promissory notes and procuring the discount thereof, and each of the parties also incurred personal liabilities by indorsing said notes. They also, with the proceeds thereof, and in reliance on said agreement, built up and carried on the business and manufactured the iron. After the parties, in reliance on this agreement, had thus created and got the business on their hands, a member could not ask release from the agreement on the ground that it is void under the statute of frauds. He is estopped from taking that position. The following authorities substantiate

this position: Thompson v. Simpson, 128 N. Y. 270, 28 N. E. 627; Trustees v. Smith, 118 N. Y. 634, 23 N. E. 1002; Rubber Co. v. Rothery, 107 N. Y. 310, 14 N. E. 269.    On December 27, 1889, Dwight, having become dissatisfied with the financial prospects, desired to close out the business; but Bulkley and Williams deemed it wise to continue, at least until the iron ore on hand should be manufactured and sold.    Dwight thereupon presented his resignation as president and trustee.    Charles J. Williams was elected trustee in his stead, and Irvin A. Williams was elected president.    Dwight, in January, 1890, refused to indorse further accommodation notes.    The plaintiff claims that, no particular period being mentioned for the duration of the said agreement, it continued in force only for a reasonable time; and that the company continued its business for an unreasonable period after January, 1890, when Dwight refused to renew his indorsements; and that, therefore, the payment of the said accommodation notes in pursuance of said agreement, in preference to the old notes, held by Dwight and Williams, was an illegal preference.    After January, 1890, when Dwight refused to proceed further under the agreement in the way of renewing his indorsements, the company continued to protect its indorsed paper held by the banks, and continued manufacturing its raw material then on hand (which had been purchased with Dwight's consent) until June, 1890, when it finally ceased manufacturing.    After June, 1890, when the company had completed the manufacture of the ore which was on hand when Dwight resigned, the company, having on hand over 11,900 tons of pig iron, was engaged in selling it until January 21, 1892, when the company was closed out by the sheriff under executions.    During that period the company used the proceeds of its sales of iron, above expenses, towards the payment of the accommodation notes.    In January, 1892, there was still on hand 4,189 tons, which was sold by the sheriff under executions for $55,735, which, by order of the court, was applied upon said executions which were issued upon judgments obtained against the company on several of said accommodation notes, some indorsed by Williams and others by Dwight; and such application was made in proportion to their respective indorsements, in accordance with said agreement.    The only creditors concerned in this matter are said I. A. Williams and the plaintiffs.

It appears that the company suffered loss by continuing, for one year and seven months after ceasing manufacturing, the slow method of private sales in disposing of its product, and that a much larger sum might have been realized upon a forced sale immediately upon going out of blast, in June, 1890.    The plaintiffs claim that this was an unreasonable continuance of the business by the trustees of the company, and that such unreasonable continuance released Dwight from the binding force of said oral agreement.    The agreement required honest action of the parties while acting as a board of trustees, with a view of carrying it out and securing to each party the protection thereof.    There is no evidence of any fraudulent act or intent on the part of any member of the board of trustees.    The question then arises, did the honest error of the board of trustees in failing to adopt the speedier method of closing out the stock of iron, and in failing to

foresee an approaching fall in prices, and thus incurring loss, have the effect of annulling the agreement, and forfeiting Williams' individual right thereunder to the preference above mentioned? I think not. Prof. Dwight, as well as each other member of the company, was obliged to submit to the united honest judgment of the board of trustees respecting the wisdom of its business methods and management. The law presumes that these gentlemen, in making this agreement, had in mind their dependence upon the honest and reasonably prudent judgment and action of the company with reference to the policy of the company in the management of its business. Each one knew that his possible future dissatisfaction with such policy and management might not control the majority of the board of trustees. Consequently the agreement implied that the accommodation notes should be paid when the company, in the exercise of its honest judgment, should decide to do so. We have to judge of the acts of the board of trustees in the light of appearances existing when they acted. I think that the method adopted cannot be adjudged as unreasonable, when viewed in that light.

In June, 1890, as above stated, the company ceased manufacturing, and from that date proceeded to close out its business. On July 31, 1890, as appears from its annual report, dated that day, the corporation was, and for several months prior thereto had been, insolvent. The entire capital stock of $50,000 had been lost, and its liabilities exceeded its assets by over $6,000. Later, in January, 1892, on winding up the business, the deficiency was found to be over $115,000. On July 31, 1890, the company paid to I. A. Williams individually a back salary of $10,122.22, pursuant to a resolution of the board of trustees passed on the 5th day of June, 1890, "for services rendered as an officer of the Kirkland Iron Company from January 20, 1888," as expressed in said resolution. Thereafter the company paid I. A. Williams a salary of $5,666.66, pursuant to a resolution of the board of trustees passed December 4, 1891, "for services as treasurer and general manager of the Kirkland Iron Company since the last settlement, June 1, 1890," as expressed in said resolution; and the further sum of $540.22 was paid after the sheriff had taken possession of all the assets of the company under executions, and after a receiver had been appointed, said payment being made in pursuance of another clause in the last-mentioned resolution which authorized the payment of his salary to "be continued until the further direction of the board of trustees." The payment to I. A. Williams of the three items of salary, amounting to $16,329.10, was made after the company had refused to pay some of its outstanding and due promissory notes, and when the company was hopelessly insolvent, which was well known to each of its trustees and officers; and such payment was made with a view of such insolvency, and with the purpose of securing to him an unlawful preference over the claim of Prof. Dwight. Such payment was therefore void. 1 Rev. St. p. 603, § 4, as left in force by Laws 1880, c. 245, § 1 (1 Birdseye's Ed. p. 679), which reads as follows:

"Whenever any incorporated company shall have refused the payment of any of its notes, or other evidences of debt, in specie, or lawful money of the

United States, it shall not be lawful for such company, or any of its officers, to assign or transfer any of the property or choses in action of such company, to any officer or stockholder, of such company, directly or indirectly for the payment of any debt, and it shall not be lawful to make any transfer or assignment in contemplation of the insolvency of such company, to any person or persons whatever; and every such transfer and assignment to such officer, stockholder, or other person, or in trust for them or their benefit, shall be utterly void."

See, also, Laws 1890, c. 564, § 48; Laws 1892, c. 688, § 48; 2 Rev. St. (Bank's 9th Ed.) p. 1022; Jones v. Blun, 145 N. Y. 333–339, 39 N. E. 954; Throop v. Lithographic Co., 125 N. Y. 530, 26 N. E. 742; Kingsley v. Bank, 31 Hun, 329.

But there are other considerations respecting this salary. On the 18th day of February, 1888, at a meeting of the board of trustees, an agreement was made orally by all the trustees that I. A. Williams should have a salary for his services as general manager. No amount was agreed upon, and no resolution authorizing such payment was recorded on the book of minutes of the corporation. But Williams acted under that agreement, and rendered valuable services, to the knowledge of the company, as general manager, outside of his duties as trustee and treasurer. Therefore, although the action of the board fixing the amount and authorizing the payment of said items of salary is void under the statute, yet he is entitled to a reasonable compensation. Outterson v. Paper Co. (Sup.) 20 N. Y. Supp. 980; Barril v. Water-Proofing Co., 50 Hun, 257, 2 N. Y. Supp. 758; Farmers' Loan & Trust Co. v. Housatonic R. Co., 152 N. Y. 251, 46 N. E. 504.

From the testimony, I think that Williams' services as general manager were worth at the rate of $4,000 per year from February 18, 1888, until the company ceased manufacturing, in June, 1890. During that period the general management involved the purchase of raw material, and the employment and payment of from 75 to 100 men in the manufacturing department. After June, 1890, he was relieved from that burden, which comprised at least half of his duties. After that date the property of the company kept running down in value, and the deficiency continued increasing the longer the company continued its existence, and Williams' duties kept lessening in amount and value. The testimony placing the value of his services at $5,000 per year can only be reasonably construed as having reference to the period during which the company was engaged in manufacturing as well as selling its product. He accepted a salary at the rate of $4,000 during that period. From these considerations, I think that from June, 1890, when the company ceased manufacturing, until the company passed into the hands of the sheriff and receiver, January, 1892, Williams' compensation should be allowed at the rate of $2,000 per year, and nothing after that date. Williams must therefore pay over to the receiver, for distribution among the creditors, the amount he has received as salary, with interest. He will be entitled to receive on final distribution his pro rata dividend on the amount hereby fixed as the value of his services. Findings may be prepared in accordance with this opinion.